by the same counsel, and the cases are related. So what the court is going to do, instead of having you argue those two cases separately, we'll just have you, absent objection, have you argue the cases together so that MITEE will address both the merits and the injunction issue in your opening argument. We'll give you 20 minutes to make your arguments. If you need extra time, we can allot you some extra time informally. But why don't we start with 20 minutes to a side, and we'll go from there. Thank you. So both 1207 and 1457, then MITEE against Harris. Mr. Taylor. Thank you, Your Honor. Your Honors, may it please the court. Let me, before you start, let me just, one housekeeping matter. Mr. Taylor, we are going to grant the motion to file a supplemental appendix. So that motion will be granted. I believe that was your motion. That was Mr. Frischnick's motion. Oh, it was the other side's motion. I'm sorry. Yes, that's right. Thank you. You're quite right. OK, very well. Thank you. First, Your Honors, MITEE would like to officially withdraw its issues on appeal, specifically with regard to whether the district court erred in denying MITEE's motion for summary judgment with respect to anticipation in view of Wood and Bjorkman, and with regard to whether the Glides infringed the patented issue. So as to those issues, we're withdrawing. The issues that we would like to address, however, are whether the district court erred in granting summary judgment on anticipation with respect to the Rowan reference, whether MITEE preserved its appeal by raising obviousness, specifically as to the 577 patent, and whether or not the district court abuses discretion in admitting the expert testimony of Mr. Jonathan Richards. And lastly, as the court just directed us to address, whether the court erred on a permanent injunction. First, with regard to the Rowan reference, there's certainly lots of points of departure between MITEE and Harris with regard to the Rowan reference. But really what the district court did, and what I would like to focus on, is the fact that the Rowan reference, and this is the only issue that the district court took issue with, is whether or not the apertures in Rowan formed extraction nozzles. MITEE does agree with the construction below that the apertures are one or more holes or slots. One or more holes, slots, or openings forming tubes or ducts through which fluid is pulled out. We certainly agree with that. And I should mention that at the time of the motion presuming judgment, that was the construction that was given by the court. At trial, there was a later construction modifying one of the terms. Now in MITEE's view, the court viewed the specification. What the difference was between the original construction and the trial construction. At trial, Harris asked that the term extraction nozzles be further limited to be just short ducts or tubes. That was not the construction at summary judgment. It was a different construction. And the court's reaction to that request was? The court allowed that further limiting, that further limitation. Well, that's what's confusing to me, because as I recall reading the record, that when Mr. Richards was specifying and referred to the tubes, the trial court said, no, no, no. Tubes are not part of the construction. Did the trial court then modify that? I think what Mr. Richards was attempting to do was to give depth to the tubes. What the court specifically said is that she's not allowing any further limitation in terms of whether there's any depth that's required in the tubing. No, there's a tube with length as opposed to a tube that's simply an aperture that's as long as the thickness of the surface in which the hole was found, right? I think that was the attempted limitation. But the court didn't allow it, right? Did not allow that. So what are you saying that the court ultimately modified the claim construction to be? To include that there would be short tubes or ducts. But short being not having any length greater than the thickness of the surface in which the hole is found, correct? She was not specific in that regard. OK. What we believe the trial court did in terms of viewing the specification in the Rowan patent was to really view it far too narrowly. One thing that it seemed like the court did not take into account is that when you look at Rowan and when you look at the devices at issue, we're not only talking about the same field of invention. We were really talking about the same field of invention to attack exactly the same problem. Rowan was designed, and it's very clear in the specification, to allow extraction of fluid through the device through the use of apertures to allow more airflow. That is part and parcel exactly the same as the purpose of the devices at issue is to allow more airflow on one hand. Of course, there are other limitations. But really, when we're talking about the aperture, the apertures are really intended to affect the same result. And since we're talking about the same field of invention and we're talking about an identical purpose, the court seemed to give no weight to that at all. And really, the court should be looking at especially a device that has the same described structure as the devices at issue for the same purpose certainly should be viewed in that vein. Was Rowan not designed, the apertures in Rowan, they were designed, as I understand it, for, as you described it, the flow of air as opposed to fluid, correct? Both air and fluid. In the case of Rowan? Yes. And in fact, there are very specific citations in the specification that say that the apertures are for the removal of, on one hand, fluid and air. And then there was a description in the specification that it removes, I believe it was wet dirt or dampened dirt particles, are carried through the apertures. And I'm referring specifically to, in the record, this is at the appendix 1298, page 4 of the Rowan patent. Starting at line 28, the air passing through the apertures, 12, provides for positive ventilation as indicated by the arrows, which act to transport away the carpet dampened dirt particles, 14 and the like. And I think what confused the trial court is this idea of positive ventilation. But when we're talking about positive, when Rowan is talking about positive ventilation, the positive ventilation occurs at the edges of this device. And the edges, as laid out in the specification, are the portions that come in contact with the surface of the carpet. So whenever Rowan is referring to edge, it is referring to the bottom-most portion of the device, the part of the device that is contacting the carpet. And when Rowan refers to positive ventilation occurring at the edges, it's referring to apertures that are there, which necessarily have to not only take in air, but have to take in fluid. But if they're configured to take in both fluid and air, what difference does it make as far as the aspects of obviousness is concerned? Yes. If you're challenging the obviousness aspects of the Rowan reference, the Rowan reference shows both air and fluid. Certainly. And if, in fact, you can configure the changes to make it only available for fluid, is it then an obvious change to eliminate the air intake? Well, I guess first I should clarify that this argument is certainly structured toward anticipation. We believe that it certainly anticipates. I do believe that the court is correct that, well, assuming the court's statements there, if it only takes in fluid, then I think it would be obvious, especially combined with the multiple prior that's out there. Certainly. So if, in fact, it's obvious with respect to air and fluid, eliminating the air from it certainly would cover anticipation also, wouldn't it? I believe so. So it would cover both anticipation and obviousness. I believe that's correct, Your Honor. Speaking of obviousness, I'd like to point out that Harris argues that MITEI has waived its right to appeal with regard to obviousness. It's not exactly clear where that derives, because when you look at the summary judgment motion that was filed, MITEI specifically, well, first, the issue that we raised with the trial court was that there was no expert testimony that was needed for either obviousness or anticipation, because the patents here are so simple that expert testimony is not needed. And what MITEI presented at summary judgment was the patents themselves, which are evidence, and we presented argument. Specifically in the record of the appendix at 770, we argued that, and this is with regard to the 577 patent, that the claims were obvious in view of Rowan in combination with either Wood or Bjorkman. And we referred specifically back to a claim chart. And this was in the appendix at 778. And it refers specifically, the claim chart itself refers to claims 13, 11, and 28. And the 10 is the independent claim from which 11 and 13 derive. And this would also cover claim number five, which is the broadest claim. And even in MITEI's reply, we argued at, and this is in the appendix at 2622 regarding 577, that it was obvious in light of Bjorkman in view of Wood. And then even in our own motion for summary judgment with respect to obviousness, we argued at appendix 1788 that we were incorporating the evidence in the argument regarding obvious from the other briefs. And it's not exactly clear why Harris is relying upon the Biotech-Bioloshi case, which is at 249, Feb 3, 1341. In that case, the patent owner actually did present evidence showing, they actually pointed out to the district court that there was no evidence presented by the other side. That's not the case here, because we actually presented the patents that we referred to, and we also presented argument. So it's not quite like the biotech case. And then while I still have some time, I'd like to move on to Mr. Richard's qualification, which I think is really a very crucial issue here. And first, I'll start with this court's ruling on SEB. In SEB, it's very easy to see why that expert would have qualified, because you were talking about a person with a degree in chemistry. He had been with the patent office for 31 years. He had worked as a supervisor in the chemistry division. And what he was asked to opine on at trial was issues that were very close to his field, working with polymers. There were some claim construction that discussed thermal bridges. These were all things within his field of expertise. Even though the device there was a deep fryer, the fact that it involved heat, heat transfer, thermal bridges, those were things that were well within his realm of knowledge. This is in stark contrast to what we have here with Mr. Richards. Mr. Richards was given three opportunities to state what his qualifications were to testify in this trial. He was given an opportunity when he was designated as an expert and produced a report. He was given an opportunity in MITEI's motion and limited to exclude his testimony. And he was also given an opportunity at trial. I certainly respect his candor, because he didn't try to stretch his qualifications much more than what he had. He just didn't have very much. And admittedly, all he had was a degree in physics, or not a degree in physics, his specialty was electrical engineering. He had a course in physics, which I believe any person who's qualified to take the patent bar has to have some degree, some knowledge of physics. And we're certainly not prepared to say that anybody who's available to take the patent bar would be qualified as an expert in this case. Now, your expert, I think it's Mr. Sakaguchi, is that correct? Correct. Right. Now, he had what struck me as fairly equivalent qualifications to Mr. Richards. Is that fair to say? No, because he had a degree in mechanical engineering. So the distinction that you're drawing is a BS in mechanical engineering is fine, but a BS in electrical engineering is not in this setting, regardless of what courses one may have taken, undergraduate courses, that would have supported the knowledge here? I believe that Mr. Sakaguchi, in his expert report, stated that a person skilled in the art would be somebody with a degree similar to his. But in direct answer to your question, I believe that Mr. Sakaguchi is certainly closer than Mr. Richards is because of the fact that this is a mechanical device versus an electrical device. Even though neither of them had worked in the carpet cleaning industry. Neither of them was a person at least at the skill of the art level that Harris was arguing. Certainly not under Mr. Richards' definition. Right. All right. Go ahead. Mr. Carroll, do you believe you will be an expert in this case? I really don't think so, Your Honor. And it's not an inconsistent argument at all because our argument is that the technology here is so simple, like the cases, then I don't need to go through them that we've cited in our briefs. It's so simple that you don't need an expert. But if you did need an expert, Mr. Richards would not be the one you would call. So wouldn't it be harmless error on the part of the district court to allow his testimony? This court said in Sundance that allowing an attorney as an expert in front of a jury is per se prejudicial because the attorney who sits there in front of the jury has this patina of authority that the jury listens to. And if you look at the testimony of Mr. Richards at trial, he literally went through claim charts, element by element, with regard to anticipation and with regard to infringement. It's certainly prejudicial in this case. Yes. Now, you said that Sundance said this was per se or not subject to harmless error analysis. I didn't remember. You may be right. I may have overlooked that. The question is with Sundance. I don't recall Sundance having said that in so many words. I can cite you to the portion that I believe that. That would be helpful. I'll tell you what, when you come up for rebuttal, maybe you can find it and give us that citation. Sure.   I'm going to ask you to come up for rebuttal. Now, I'd like to talk about the issue regarding the permanent injunction. That is another very interesting decision by the district court, because there are portions of evidence that she just failed to consider, such as the length of time for Harris to seek any injunctive relief at all. And I think that this court has said in Acumad, that is a factor that can be considered. Another thing that I believe the court did that was incorrect was to exclude Mighty from introducing relevant testimony from Harris's own expert regarding antitrust. Their own expert said that they're not competitors in this industry. I know what Harris is going to argue. Certainly, they're arguing that in our complaint, we allege that we're competitors. The district court specifically said in her ruling that, and if it's true, that we dismissed the antitrust portion of our complaint. So that allegation regarding being competitors is really attached to the allegation regarding antitrust behavior. But what the district court never gave any justification for excluding the evidence of their expert for the purposes of permanent injunction. Mr. Glick just would not consider it, would also not give any weight at all. And I believe this court has said you have to give weight to the amount of time that's passed before they ask for injunctive relief. Didn't the district court say they weren't going to consider the experts that could be presented at trial? That's exactly what she said. I believe this court has said in acumen that you can present evidence regarding equitable issues that weren't presented at trial. I don't believe it would have been appropriate to bring that testimony in front of the jury because it was not an issue that the jury would consider. Equitable issues. But your argument, though, would lead us to believe that if you don't file for a PI, then you could never obtain a permanent injunction? No, it's just a factor that the court should consider, but she refused to. It would depend upon the circumstances. I'm sorry. The trial went on for several years from the initial filing of the complaint. So if, in fact, they file for a PI and fail to obtain it, that's an appealable denial. Correct. So in effect, if we rule that the judge has to take into account the filing for a PI, would that make it a denial of a PI, then a requirement for all of the cases before us in order to obtain a permanent injunction? I would think it's a factor that the court should consider, and it really should be on a case-by-case basis. But it certainly here, combined with the other factors, I think leads to a conclusion that there's no irreparable harm. Very well. We will restore five minutes of rebuttal time. Thank you. Good morning. These appeals address Harris Research patents, which protect carpet cleaning technology that's used globally by ChemDry franchisees. And they follow a jury verdict for Harris Research, upholding the validity of the patents and finding that mighty infringes. And the appeals fail because they ask this court to address obviousness issues that were not preserved for appeal. They ask the court to take an independent look at the facts and to reweigh the evidence in this case. And they ask this court to ignore the boundaries of the trial court's discretion with respect to expert testimony and permanent injunction. I'm sorry, could you ask that again? Versus allowing the jury to review the facts with determination of obviousness. Do a rather odd procedural aspect for the court to accept? If you're asking, is it odd for the court to grant summary judgment on anticipation and allow obviousness to go to the jury? My understanding is that the court granted summary judgment for Harris Research on the obviousness issues. So they, in fact, did not go to the jury. Would it make any difference if it was reversed? So if I understand, Your Honor is asking if the court granted summary judgment on anticipation and allowed the obviousness issues to go to the jury, would it make any difference as to the procedural error required in this case? I'm not sure that I'm sorry, Your Honor. I'm not sure I know the answer to that question. I apologize. Let me make sure I understand the claim construction that I was discussing with Mr. Taylor earlier and how that issue ultimately got resolved. The reference to tubes, normally the term tubes suggests something that has a greater length than simply an opening. But I take it, correct me if I'm operating under a misapprehension here, but I take it that the trial court's construction of the term tube is really no different from what we would normally think of as opening or aperture in a surface. Is that correct? My understanding of what the district court's claim construction of tubes is whole slots or openings that serve as liquid extraction nozzles, meaning tubes or ducts through which fluid is pulled out. Yeah, defining tube, the word tube. Sure, sure. But what I'm trying to get at is, are we talking about a definition, with specific reference to the, Mr. Richards was testifying, I'm sure you recall that. And Mr. Richards tried to say, well, that these weren't tubes of any length, at which point the trial court interrupted him and said, no, no, they don't have to be of any length. All they have to be is a hole through which fluid flows, correct? Correct. Is that my recollection? Yes. OK, now, was that the construction of the term tube that was maintained throughout the trial? Yes, that's my understanding. So it would be incorrect to say that you could use the notion of a tube, as we conventionally think of it, as a basis for distinguishing some of the prior art, correct? My understanding is that the court did not construe the term apertures or tubes in terms of length. All right. So the remaining. Why isn't, say, I mean, turning to the intermediate question, then, to go to the issue that Mr. Taylor was stressing, why isn't Rowan invalidating prior art? Because MITEI attributes the function of Rowan's overall system of apertures and the different functionality of all of those apertures to a particular set of apertures that it identifies as the invalidating features of the Rowan invention. In fact, those apertures do not have the function that's required by the limitation of the Harris Research patents. Those are apertures that pull in air, not fluid. Correct. The district court. There are other apertures, I take it, There may be. Certainly. Yes. Yes. Yes. And the reason, I think, Your Honor, that may help understand this is that the apertures, the asserted claims of the patents require that the apertures be in a base plate or formed in the bottom of a base plate. And several of the asserted claims place the apertures in an array. And in order to try to get around all of the asserted claims of the patents, MITEI was forced to pick particular apertures in the Rowan patent and identify those apertures as the invalidating features to try to hit all of those different asserted claims and their limitations. And so that's why they're stuck with looking at these particular apertures and not the other apertures of the patent. And that's where we're at on review. And the bottom line is that the relevant apertures of Rowan simply are not liquid extraction nozzles, meaning tubes or ducts, through which fluid is pulled out. I might also add on that issue that Campbell is a dandruff removal device that describes nozzles of open notches, not tubes or ducts, from which fluid is pulled out. And as MITEI mentioned, they don't appeal the claim construction in any manner on this issue. So the district court simply did not err in granting summary judgment for Harris' research on validity. Well, the court did not hear a motion for summary judgment on anticipation with respect to Wood and Bjorkman, I think. Yes. And why do you think that the court was correct to grant summary judgment on obviousness with respect to combination that included Wood and Bjorkman? The district court's grant of summary judgment on obviousness was correct because patent cases are very hard for district courts. MITEI bore a standard of proof... But it's not sufficient, Grant. Certainly. Certainly, if you could follow my steps, Your Honor, I would appreciate it. MITEI bore a burden of demonstrating invalidity on clear and convincing evidence. And in response to this heavy burden, what they produced, they never argued that claims 5 or 10 of the 577 patent were obvious. It limited any argument with regard to obviousness on the 892 patent to headings in the summary judgment briefs that gave no analysis whatsoever. The 892 patent is not even mentioned in the claim chart exhibit that they are discussing right now. Well, we're concerned, I think, principally, at this point, are we not, with the 577 patent and particularly the three claims that were challenged, right? Yes. So focusing just on the 577, there were three claims that are addressed in the claim chart. Okay. Why was it correct to grant summary judgment? So the district court correctly granted summary judgment because MITEI didn't bother to set forth any analysis under the Graham factors and it referenced those patents in its claim chart, but it didn't give any analysis, it didn't give any citations with respect to some of the particular prior art that was at issue. And the district court said that this was insufficient, correctly, to show by clear and convincing evidence that those patents were invalid or that they could be held invalid. But it was sufficient to get by summary judgment for anticipation with respect to at least a court would regard this exact same chart. Your Honor, I would have to look at the district court's analysis to see how they handled the anticipation issue and how that compared to how it handled the obviousness issue I'd simply have to look in order to answer that question correctly at how the district court did that. I have not compared the analysis of anticipation with the court's view of the record with respect to obviousness. I have. I found it a little puzzling, but why don't you go ahead. Okay. How about Mr. Richards and how is Mr. Richards all that different from the experts in Sundance? Certainly. So the threshold that Sundance and SEB set was an adequate relationship between experience, between the expert's experience and the claimed invention. And here we have this adequate relationship. The court asked counsel for mighty with respect to education. We're talking about experience here. An expert isn't solely his... He isn't solely qualified based on his education. It's also his experience. And Mr. Richards established the basis for an education that had courses in air flow and fluid dynamics, principles that underlie the technology of the patents. He talked about his coursework and training in mechanical devices and principles, including how mechanical structures affect air flow characteristics. But he also talked about significantly his direct experience in patent matters with devices of a mechanical and electromechanical nature. And he specifically testified at trial with regard to his experience of the basic components of the technology. He talked about the barriers and apertures that really form the mechanical aspects of the devices at issue in this case. But that's more fluid dynamics rather than anything that he had any experience in. I would argue, Your Honor, that the patents at issue have fluid dynamics components and they also have a significant portion of mechanical components. And that's what was lacking in Sundance. Here we have an expert that is testifying with regard to, arguably, a field of mechanics. The court specifically highlighted that that expert didn't even say that he had an expertise. There was no suggestion of expertise in mechanics. And here, this case presents many more facts on this issue showing an adequate relationship than does Sundance. And reversing the district court here would expand the holding of Sundance because of those additional facts that we have regarding his experience with mechanical devices. It would take a bigger chunk of the discretion away from the trial courts and, Your Honor, it would depart from the traditional notions of Rule 702 that allow testimony even when that expert isn't narrowly qualified to match the specific point at issue in the case. What kind of an expert would be required in this kind of a case where the technology is so simple that even somebody with a BA degree could figure it out? Well, and that's where we agree with Mighty in the sense that this is a case-by-case analysis. And that's why the district courts have discretion. One judge might view it somewhat differently than another. But I think it is case-by-case and I think it's within the trial court's discretion. And I might also add with respect to this simple technology issue, Mighty in its summary judgment briefings actually argued that expert testimony may be useful in the case. In the record on page 1766 in its motion for summary judgment opposition, Mighty states, expert testimony may be useful to the court. So that's a stance that it took in direct opposition to where we are today and what Mighty is arguing. To say that expert testimony may be useful doesn't mean that anybody can walk in off the street and be claimed to be an expert. Certainly, and what I'm saying is with regard to the argument that the technology is so simple. It's so simple. In hindsight, certainly, after things have been exhaustively addressed through trial, some things might appear simple. But on first blush, a district court or the parties might consider an expert testimony necessary to try to digest some of these issues. So very quickly on the permanent injunction, we've cited the case law stating that the court doesn't have to consider every factor as part of exercising its discretion. Here, there's an admission that the parties are competitors and Mighty's infringement would result in a loss of the right to exclude a competitor, loss of reputation for innovation, and enforcement of IP because Harris Research's technology is incorporated into the primary tool that its franchisees are using across the world. And it would ultimately result in loss of goodwill between Harris Research and its franchisees because the franchisor's protection of that technology that's in such pervasive use is an important part of the bargain between a franchisor and a franchisee. So, Your Honors, we would ask that this court affirm the district court in all respects. And thank you. Thank you. Mr. Taylor, I don't know if you have any. I read, Your Honors. First, with regard to the issue of Mr. Richards, Mighty made it clear in its motion in limine in its papers and its argument before the district court that we believe that no experts should have been required that included Mr. Richards and it included Mr. Sagaguchi because the, and it's exactly because of the reason that the technology is so simple. And then with regard to Mr. Richards' experience. Doesn't it suggest that perhaps the error in allowing an expert to testify absent some outrageous statement made specifically made by the expert would be harmless? No, Your Honor. I believe that the, and this is what the court stated in Sundance, that unless a patent lawyer is a qualified technical expert, his testimony on these kinds of technical issues is improper and thus inadmissible. And I think that what the patina of the expert provides to the jury is that there's some extra authority and extra weight that has to be assigned to listening to the experts and evaluating whether these experts, you know, whether one is more credible than the other. And I think it obscures to the jury the importance of the actual evidence, which is the patents themselves. Yes. Is the Sundance hold a per se error to allow that testimony? I don't believe so, Your Honor. I believe that it looked overall to the, to the quality and the force of the testimony of the expert and to what extent the testimony played an issue at trial. And I think that's what we have here. So the jury is open to harmless error? Harmless error masks? I think necessarily, but I don't think there's harmless error here. Okay. By a long stretch. And with regard to Mr. Richard's expertise, the classes that he took that covered any sort of fluid dynamics or issues of mechanics were 26 years ago when he was in college. He certainly had an opportunity at trial and in an affidavit that he submitted in response to our motion in limine. To expound upon his experience, he could have stated in his affidavit or at trial, yes, I've had comparable experience in this field of patents. And it translates over to these, these vacuum devices, you know, for the following reasons. He never did that. At least in Sundance, the expert there actually testified that he had some experience in the auto industry. And that case, of course, involved truck bed covers. So there, at least, there was, I would argue that the expert in Sundance had more experience than Mr. Richards did here, comparatively. And then lastly, with regard to the injunction, there was no evidence presented at trial regarding a loss of goodwill, a loss of, or tarnishment of reputation of Harris as a result of Mighty selling these devices. There was not a single letter, not a single witness of one of the franchisees stating that allowing some other person to sell these devices is harming us. There was just no evidence, really, at all, of what the actual harm was. And I think what the district court did, and it's, it's actually explicit in her, her, her ruling, she made certain assumptions of things that weren't presented at trial, while at the same time preventing Mighty from introducing evidence or considering evidence and facts that Mighty presented. And if, unless the court has any questions of me, I will conclude. Thank you.